Chase J. Potter
Texas State Bar No. 24088245
potter@imcplaw.com
Greg McAllister
Texas State Bar No. 24071191
greg@imcplaw.com
Joshua L. Shepherd
Texas State Bar No. 24058104
shepherd@imcplaw.com
Jesse A. Okiror
Texas State Bar No. 24065843
jesse@imcplaw.com
IACUONE MCALLISTER POTTER PLLC
Energy Square One
4925 Greenville Ave., Suite 1112
Dallas, Texas 75206
(214) 432-6744 – Telephone

COUNSEL FOR THE AGENT AND
SPECIAL COUNSEL FOR
AREYA HOLDER AURZADA, TRUSTEE

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **IN RE:** § | **Case No. 23-30035-mvl7** |
| § | |
| **ANIMO SERVICES, LLC,** § | **Chapter 7** |
| § | |
| **DEBTOR.** § | |

| | | |
|---|---|---|
| **AREYA HOLDER AURZADA, TRUSTEE,** § | |
| § | |
| **Plaintiff,** § | **Adversary No. 25-03020-mvl** |
| § | |
| **v.** § | |
| § | |
| **MBO PARTNERS, INC., and THE GREAT REALIZATION, LLC,** § | |
| § | |
| **Defendants.** § | |

## TRUSTEE'S FIRST AMENDED COMPLAINT

Pursuant to the Court-approved Agreement and Joint Prosecution Agreement,[1] and the *Order Granting (I) Defendants' Motion to Dismiss Complaint, and (II) Plaintiff's Motion for Leave to Amend Complaint* [Adv. Dkt. No. 19], GloriFi Acquisitions, LLC (the "Agent") as the exclusive agent of, and in the name of, Areya Holder Aurzada (the "Trustee"), the duly-appointed Chapter 7 Trustee for the estate (the "Estate") of Animo Services, LLC (the "Debtor" or "ASL"), the debtor in the above-styled and numbered chapter 7 bankruptcy case (the "Bankruptcy Case"), pending in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court" or the "Court"), files this *First Amended Complaint* (this "Amended Complaint") against MBO Partners, Inc. ("MBO") and The Great Realization, LLC ("TGR," and collectively with MBO, the "Defendants"), and would respectfully show the Court as follows:

## I.   SUMMARY

1. After working to acquire MBO, good friends and long-time business partners Toby Neugebauer ("Neugebauer") and Miles Everson ("Everson"), went on to formulate and execute a scheme whereby MBO and TGR (being solely owned and controlled by Everson) would be the beneficiaries of a sweet-heart deal with the Debtor that was meant to benefit insiders to the extreme detriment of the Debtor's unsecured creditors. This arrangement allowed the Defendants to exercise influence and managerial control over the Debtor, paving the way for Defendants to over-staff the Debtor with consultants who over-billed, at above market rates, for unnecessary, duplicative, or even phantom services or "benchmarks" that never resulted in a tangible benefit to the Debtor. In exchange, Neugebauer and the Defendants ensured that the Debtor paid the Defendants a total of $8,789,004.61 in less than 12 months, a shocking sum far and away greater

---

[1] *See Motion to Approve Sale of Interests in Unecumbered Causes of Action Free and Clear of Interests* [Bnky. Dkt. No. 84] and the Court's *Order Approving Sale of Interests in Unencumbered Causes of Action Free and Clear of Interests* [Bnky. Dkt. 94]. Hereinafter, the "Agreement" and the "Joint Prosecution Agreement."

than that received by any of the Debtor's other vendors. This Adversary Proceeding aims to redress these wrongs and bring Defendants' ill-gotten gains back into the Estate.

## II.   JURISDICTION AND VENUE

2.   The Court has jurisdiction over this matter and the relief requested herein under 28 U.S.C. §§ 157(b) and 1334. This matter presents a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and this Court may enter final orders for the relief requested herein.

3.   Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409 because the Bankruptcy Case is pending in this district and the causes of action asserted herein arise in, and are related to, that case.

4.   The statutory and legal predicates for the relief sought herein are Sections 502, 544, 547, 548, and 550 of the Bankruptcy Code[2], TEX. BUS. & COMM. CODE §§ 24.001, *et seq.* ("TUFTA"), and Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## III.   PARTIES

5.   The Trustee is the duly appointed Chapter 7 Trustee of the Debtor and the Estate, and along with the Agent pursuant to the Agreement and Joint Prosecution Agreement, files this Amended Complaint in such capacity.

6.   Defendant MBO is a corporation organized and existing under the laws of the State of Delaware. Defendant MBO has already appeared through counsel in this Adversary Proceeding.

7.   Defendant TGR was a limited liability company organized and previously existing under the laws of the State of Texas. On March 10, 2023, TGR forfeited is charter, certificate, or registration pursuant to Section 171.309 of the Texas Tax Code (the "Forfeiture"). Despite the

---

[2] 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").

forfeiture, TGR is able to participate as a defendant in this Adversary Proceeding.[3] Defendant TGR has already appeared through counsel in this Adversary Proceeding.

## IV.   FACTUAL BACKGROUND

8.      An involuntary petition for relief was filed against Debtor under Chapter 7 of the Bankruptcy Code on January 4, 2023 (the "Petition Date"). On February 9, 2023, the Bankruptcy Court entered its *Order for Relief in an Involuntary Case* [Bnky. Dkt. No. 12].

9.      As an affiliate of With Purpose, Inc. ("WPI")[4], the Debtor operated under an umbrella of a multitude of its additional affiliates, all doing business under the name "GloriFi." The business as a whole was a finance technology start-up with the aim of developing a conservative financial platform. GloriFi was founded by Neugebauer.

10.     GloriFi's mission was to ultimately offer checking and savings accounts, credit cards, mortgages, brokerage accounts, insurance policies, and potentially other financial products and services. With this financial platform, GloriFi worked to develop an integrated proprietary software system (the "Tech Stack"). It was intended that the customer-facing components of the Tech Stack would include an "app" for use with mobile devices (the "GloriFi App"), as well as a website the Debtor planned to launch on March 31, 2022.

**A.    Two Friends, "Project Banzai," and the Acquisition of MBO**

11.     In addition to founding GloriFi, Neugebauer was the majority interest holder in the Debtor and a member of the Board of Directors. Neugebauer is long-time friends with Everson, and the two have worked closely as business partners dating back to at least 2018. Everson has

---

[3] *See* Tex. Bus. Orgs. Code § 11.356.

[4] WPI is a debtor in its own Chapter 7 bankruptcy case which is also pending in this Court as Case No. 23-30246-mvl7.

been identified internally within GloriFi as a "longtime partner of [Neugebauer]'s on several projects."

12. One such project started coming together during the 4th quarter of 2018, when Neugebauer and Everson began work on what they called "Project Banzai." Neugebauer and Everson included their other friend, Joe Forehand ("Forehand"), and the three commenced work on the project. The intent of Project Banzai was to create a consulting business, where smaller component businesses would be acquired in order to create a larger consulting firm. As explained by Neugebauer on November 14, 2018:

> 1. A year ago my friend Miles Everson who runs PWC global consulting ask how one would go buy out the PWC consulting business from the PWC mothership. Because of the conflict rules the consulting business growth is significantly constrained.
> 2. It's important to understand that the big 4 accounting firms are not one big company but are more like a franchisor with 150 different franchisees (usually a country is a separate franchise). In the "you can't make this "&##¥" up" this organization complexity dramatically reduces the economic opportunities for these firms. No better example is that Miles began trying to put together a uniform set of financial statements for PWCs consulting globally in June 2017 and here we are in November 2018 and the worlds most respected accounting firm is not done yet. How do you run a global business without a global set of financial statements? You don't, and that not sustainable.

13. One of these component businesses that the long-time friends sought to acquire was MBO. In fact, for purposes of exploring MBO's acquisition, on October 7, 2018, MBO entered into a *Mutual Confidentiality Agreement* with Dorado Holdings, LLC, a Delaware limited liability company, which on information and belief, was owned and/or controlled by Neugebauer (or an entity that Neugebauer owned and/or controlled). Approximately a month later, having had the further opportunity to conduct diligence, Everson emailed Neugebauer and Forehand stating: "I think MBO is a potential real strategic advantage."

---

**AMENDED COMPLAINT** **Page 5 of 32**

14.    In order to advance Project Banzai, a vehicle to acquire the target companies – such as MBO – was needed. Accordingly, on January 18, 2019, Banzai Capital Management, LLC ("BCM") was formed by the Project Banzai team through the filing of its Certificate of Formation with the Delaware Secretary of State.

15.    After BCM's formation, in a February 5, 2019 investor presentation, Neugebauer, Everson, and Forehand are prominently identified in their leadership roles:



To be clear, this investor presentation identifies BCM and its affiliates as "Banzai":

> This presentation has been prepared by Banzai Capital Management, LLC (together with its affiliates, "Banzai") solely to determine preliminary investor interest in Banzai Capital Management Holdings, (the "HoldCo"); it is not an offer or solicitation, and may not be used or relied upon in connection with any offer or solicitation, with respect to the HoldCo or any other future Banzai investment opportunity.  An offer or solicitation with respect to the HoldCo, if made, will be made

16.      Over time, Forehand stepped away from Project Banzai, leaving close friends Neugebauer and Everson to continue with their original vision. To that end, on March 18, 2019, Neugebauer emailed Everson stating: "So I want to reignite Banzai cap management." That same day, Everson responded: "I agree we should reignite BCM. I do like MBO and there is a deal to be had there."

17.      Neugebauer and Everson subsequently accomplished that deal. Everson became an owner in MBO, and in or around July 2019, Everson stepped into the role as MBO's Chief Executive Officer. Moreover, on information and belief (based on the materials in the Trustee's possession as of the date of this filing, and without the benefit of conducting any discovery), it appears that BCM (and/or another entity owned and/or controlled by Neugebauer and/or one of Neugebauer's affiliates) acquired some type of ownership interest, phantom equity, and/or some other type of financial interest in MBO.

**B.      Defendants Receive a Sweet-Heart Deal to Drain the Debtor**

18.      As Neugebauer was ramping up the GloriFi enterprise, on August 28, 2021, he emailed Everson regarding getting MBO involved. In response, Everson stated that he was engaged in a deal that was "consuming my brain power and time" and that "I will get me (*sic*) team cranking on people next week." In reply that same day, Neugebauer ensures that his close friend will be taken care of, stating:

> You are on my team
> Focus
> Focus
> We have you in our founders round
> We have had to make changes cause of all the changes
> But you will make a shit ton off this deal

---

**AMENDED COMPLAINT**                                                    **Page 7 of 32**

19.     Thereafter, in what was the polar opposite of an arms-length transaction, Neugebauer – through ASL – gave his good friend and long-time business partner Everson a sweet-heart deal so that Everson and his companies would in fact "make a s\*\*t ton off this deal." Effective October 4, 2021, ASL, MBO, and TGR entered into an *Agreement for Services Between Animo Services, LLC, The Great Realization, LLC, and MBO Partners, Inc.* (the "MSA").

20.     Through the MSA, ASL engaged TGR "to provide services as defined in the attached Statement of Work." The attached Statement of Work ("SOW"), however, was in large part **blank**, including the portion of the SOW where the parties were to "[p]rovide a detailed description of the project below."

21.     The MSA further provided that TGR "…has engaged a third Party, MBO, to perform billing and collection and other administrative services for [TGR]." Everson's MBO appears to have served as an unnecessary "middle-man" liaison between ASL and Everon's TGR. TGR, in turn, served as a consultant to allegedly assist the Debtor in obtaining outsourced programming services, oftentimes from overseas, toward development of the Tech Stack. For example, the Debtor would design and architect what the screens of the GloriFi App would look like, and then outsource the programming of that to Defendants' teams. Defendants would even "embed" their principals into the Debtor. These principals had special access to the Debtor's premises, essentially working at the Debtor's office full-time (the same office used by the entirety of GloriFi, and is also Neugebauer's home) in order to liaise with programming teams abroad. Additionally, through the MSA, these principals had access to ASL's confidential information.

22.     In addition to his ownership of MBO and role as CEO, Everson was the founder, owner, and Managing Member of TGR. This common ownership and control by Everson was a fact that was undisclosed (and misrepresented) within the MSA, with MBO being anything but a

"third party" to be "engaged" by TGR. Moreover, Everson only formed TGR less than two-weeks before Neugebauer and Everson caused the entities (that the long-time business partners and friends commonly controlled) to ink the insider transaction – *i.e.*, the MSA.

23.     Prior to entering into the MSA, TGR had no independent contacts or pre-existing business relationships. Rather, it was created by Everson solely as a vehicle to obtain a second income stream under the MSA. This unnecessarily over-layered arrangement resulted in ASL paying not only the excessive price in each SOW, but also an unnecessary additional twenty percent (20%) for "oversight and administration services" allegedly provided by the Defendants, namely MBO. Apparently without *intended* irony or hypocrisy, this additional 20% fee was referred to as an "uplift" charge. In other words, Everson had orchestrated an arm-in-arm deal (far from an arms' length transaction) to overcharge and skim money from the Debtor via over-staffing, over-billing, and with an additional "uplift" fee (that uplifted his own pockets).

24.     The simple reality is there was no need for there to be two separate entities as counterparties to the Debtor in the MSA. TGR (*i.e.*, "The Great Realization") was aptly and brazenly named as it embodies Everson's "great realization": Due to his close relationship with Neugebauer, Everson would be free to skim and raid the Debtor's coffers and, as Neugebauer stated, "make a s**t ton" off the scheme.

25.     On one hand, Everson owned and controlled both of the Debtor's counterparties to the MSA. On the other hand, GloriFi investor materials dated November 22, 2021, represent that Everson intended to also be a Director on the GloriFi Board of Directors.

**GloriFi Board of Directors**

**TOBY NEUGEBAUER**
**Chairman & Co-Founder**

Mr. Neugebauer is an entrepreneur, investor, developer, business owner, and philanthropist serving as managing partner of multiple companies. After working at Kidder, Peabody & Co., Mr. Neugebauer co-founded Windrock Energy (sold to Macquarie) and subsequently Quantum Energy Partners where he was co-managing partner investing in energy related assets globally. After five consecutive funds at Quantum, Mr. Neugebauer partnered with leading executives and technologists to build and invest in companies at the forefront of demographic and technological changes. Mr. Neugebauer has focused his philanthropy on family formation and preservation in the inner cities of the United States. Abroad he has worked with orphanages in China, helped build and maintain schools in Africa, specifically in Rwanda and Zambia, and supported children in Africa financially. He also heads an organization encouraging philanthropy and generosity. He is originally from West Texas and received his Bachelor of Business Administration Finance in 1993 from New York University. He lives in Dallas and Aspen with his wife and has two boys, Nate and Noah.

**NICK AYERS**
**Vice Chairman & Co-founder**

Mr. Ayers is one of America's leading public policy and business strategists and investors. Most recently, Mr. Ayers served as Chief of Staff to Vice President Mike Pence between July 2017 and January 2019. He had previously served as national chairman for Pence's vice-presidential campaign in 2016, and as the former executive director of the Republican Governors Association from 2007 to 2010.

Today, Mr. Ayers invests in and advises organizations in healthcare, software, financial services, and business services. Nick recently partnered with Insight Venture Partners to acquire Veeam Software, where he now serves as a member of Veeam's board of directors.

Time Magazine named Mr. Ayers one of the "40 most influential people in politics under the age of 40" and The Wall Street Journal called him a "political prodigy." The World Economic Summit nominated Mr. Ayers to join the forum as a Young Global Leader. He received a Bachelor of Political Science degree from Kennesaw State University.

Mr. Ayers lives in Atlanta with his wife Jamie and their three children.

**ANNA BOFA**
**Director**

Ms. Bofa currently the Founder and CEO of Curitt, is a Board member of Spacehive, and an Investor and Commercial Director of Verum Inventa.

Ms. Bofa was the Global Head of Community Partnerships Programs at Facebook where she oversaw a global team responsible for conceptualizing and building services, initiatives, and product concepts and taking them to market. The programs support an audience of millions of users across all of their platforms.

Before joining Facebook Ms. Bofa ran her own consulting arm, working to help businesses scale in Africa and Europe. Prior to that Ms. Bofa was an early member of the Pinterest business team, responsible for their monetization strategy pre IPO, where she helped launch their first money-making initiatives and helped to build the sales & partnerships teams and strategy.

Ms. Bofa was also an early employee at Dropbox, pre-revenue, where she helped build their enterprise offering and focused on user growth and partnerships as an early member of the team. Ms. Bofa began her career at Google on the New Business Development team. She is a graduate of Dartmouth College and has lived and worked in 6 different countries, currently based in London and was born and raised in California.

**MILES EVERSON**
**Director**

Mr. Everson is currently CEO of MBO Partners. Prior to that, he served as Global Advisory and Consulting CEO for Pricewaterhouse Coopers, leading the company's Asia Pacific Americas Advisory and Consulting businesses. Before joining MBO in 2019, Mr. Everson had a rich career with PwC, spanning almost three decades. He began in the firm's Assurance practice, moving to leadership roles within Advisory/Consulting in both Canada and the US, including several Financial Services leadership roles, and eventually became the US Advisory/Consulting Vice Chairman. In 2015, he stepped into the new role of Asia Pacific Americas Advisory and Consulting Leader to help globalize the Advisory/Consulting practice. Mr. Everson is a Certified Public Accountant, a member of the American Institute of Certified Public Accountants and Minnesota Society of Certified Public Accountants. He graduated from St. Cloud State University with a BS in Accounting.

**GLORI·FI**

26.     Unsurprisingly, in audited financial statements, MBO is disclosed as a "related party" to the Debtor. Everson also served as a board member and founding shareholder of Animo Bancorp, Inc., an affiliate of the Debtor and WPI.

**C.      Defendants are Paid Money for Nothing, and Work to Ensure that Remains the Case**

27.     With the MSA in hand, Defendants immediately began working with PricewaterhouseCoopers (which was Everson's former employer for over 30 years), and specifically PricewaterhouseCoopers – Czech Republic ("PWC"). PWC would be the *actual* source of the outsourced programming services which were actually provided to ASL, if any.

28.     Shortly after the execution of the MSA, on November 10, 2021, Everson emailed ASL's representatives with an amendment ("Amendment One"). Amendment One (i) created a 15-day deadline for ASL to remit invoice payments; (ii) allowed TGR to charge interest at the rate of 0.05% for *every day* of delay in payment of an invoice; (iii) attempted to provide Defendants' additional liability coverage; and (iv) allowed TGR to conduct screening of third party suppliers

**AMENDED COMPLAINT**                                                                           **Page 10 of 32**

on a less stringent basis than originally provided for in the MSA. Of course, ASL executed Amendment One that same day, without any pushback of proposed revisions, thereby further sweetening Defendants' deal with the Debtor.

29. With Amendment One in hand, Defendants immediately started directing the overstaffing of ASL with outsourced programming consultants, and then, of course, invoicing the Debtor based upon the over-billed and duplicative "work" of those consultants. As one former ASL employee commented, Defendants "put a small army of people on it." Moreover, a mere five days after the execution of Amendment One, the Defendants also invoiced ASL for a "Project Ewing Milestone" in the amount of $116,393.13. A second "Project Ewing Milestone" invoice for $121,550.40 was dated November 22, 2021, with a third following on November 29, 2021, in the amount of $113,482.80.

30. And thereafter, so it went – a steady stream of invoices from the Defendants, followed by a steady stream of payments by ASL to pay each of the antecedent debts. A spreadsheet reflecting (a) each of the invoices ASL paid to MBO, identified by date, amount, and the (alleged) basis for each invoice (*i.e.*, "hourly work," "Project Ewing Milestone," etc.); and (b) each of the invoice payments ASL made to MBO, identified by the date of each transfer, the amount transferred, the method of payment (*i.e.*, "ACH"), and the originating bank account is attached hereto as **Exhibit "A,"** and incorporated herein by reference for all purposes. With the bloated and unnecessary staffing by the Defendants, the Debtor was often unclear as to what it was even allegedly provided and being asked to pay for. In response to ASL's inquiries as to the reason for receiving a November 23, 2021 invoice for $250,620.00, followed by a November 24, 2021 invoice for $116,393.13, on November 29, 2021, PWC responded with the information the MBO invoices purposefully did not include and acknowledging the money-for-nothing "uplift" of 20%:

> The larger invoices covers all of our services between 4th October and 12th November. The second invoice covers all reported hours between 15th to 19th November. This amount was then uplifted by 20% as agreed in the triparty agreement (Animo + The Great Realization + MBO partners).

31.     As Defendants' invoices continued to roll in, the Debtor's representatives (other than Neugebauer, of course) continued to have concerns, including as to whether there were even executed SOWs. In an internal email dated December 23, 2021, ASL's Chief Financial Officer, Jonathan Pennington ("Pennington") stated:

> I do have some concern if there are no SOWs. The MSA is a governing document that states all work will be outlined in Statements of Work, but if those don't exist, I am not sure how well defined the work being performed is. … With Purpose/GloriFi needs some governance over what MBO/PwC are working on and without the SOWs, I am not sure how we can ensure things are staying between the lines.

32.     Of course, they were not "staying between the lines" – because the intention was always to color far outside the lines to ensure Neugebauer's long-time friend and business partner Everson (and, perhaps, Neugebauer himself) made "a s**t ton off this deal" through ownership interests in Defendants.

33.     For example, nowhere within the MSA or Amendment One is there a reference to "Project Ewing." Accordingly, what then were the "Project Ewing Milestones"? How was ASL to determine if those "milestones" had even been met? Or if those charges were legitimate? The Defendants' opaque invoices and the lack of SOWs were by design, to keep the Defendants' gravy-train rolling and unchecked. As a further follow-up on December 23, 2021, Pennington raised additional issues with the Debtor's recently hired Vendor Manager:

> Fred – I wanted to alert you to a potential issue with MBO/PwC. I don't see anything in Tandem, but Katie has provided the MSA and she has indicated a couple of times that this is in Tandem. The bigger concern I have is that there do not seem to be any SOWs being created as we work with MBO/PwC. We have paid

this group ~$800k but we don't seem to have any means to understand how big of a work effort this is.

34.     Pennington's concerns about understanding the scope of the Defendants' "work" were well founded. Without any guardrails (as was intended by Neugebauer and Everson), and with Defendants' principals embedded into ASL and working full time at the office (*i.e.*, Neugebauer's home), Defendants continued to fleece the Debtor. In fact, TGR went so far as to document Defendants' control over the Debtor. A *Statement of Work Between The Great Realization LLC and Animo Services LLC* (the "Insider SOW"), states:

> ## RECITALS
>
> Whereas, Flavio Palaci (the "Agent") is an agent and representative of TGR and has a crucial importance for TGR, TGR's operations, revenue and revenue stream;

This SOW goes on to acknowledge that:

> ### 1. Services Provided by the Agent
>
> It is mutually agreed that the Agent will play two important roles on behalf of the Client. The Agent will lead the Command Center and with that role, his aim and objective will be driving the ownership of the critical path across all product lines of the Client, which will also include vendor management and operational readiness.
>
> The Agent will also be charged as the Chief Product Officer of the Client and his primary role will be to ensure the execution of the Client's Chief Executive Officer's business strategy to the relevant product suite; as the organization structure of the Client is not yet formalized, the Client and TGR hereby envisage that that the roles including but not limited to product analytics, product engineering, product design and experience fall within the Chief Product Officer's responsibility.

Of course, the "Client" is ASL, and the "Client's Chief Executive Officer" is Neugebauer. If not already obvious through Everson's close relationship with Neugebauer and the Defendant's

principals being ever-present at the Debtor's office using ASL's confidential information to direct operations, this SOW is a clear acknowledgment of Defendants' influence and control over the Debtor.

35.     Ultimately, Defendants received payments of *over $8.7 million* in the course of less than 12 months. All for directing the intentional overstaffing of a failed project when Defendants knew the Debtor was financially vulnerable. This exorbitant amount – which is a wild number for *any* consulting services over such a short period of time (much less illegitimate services designed to line the pocket of Everson) – made MBO far and away the highest paid of the Debtor's vendors. In fact, MBO was the largest of the vendors, by receipt, across the entirety of the GloriFi business enterprise.

**D.     The Debtor was Insolvent, or otherwise Financially Vulnerable Throughout the Entirety of its Relationship with Defendants**

36.     While ASL was formed in late May of 2021, it sat inactive until the latter part of the year. Woefully undercapitalized, and without any source of generating its own revenue, ASL continuously remained in a cash crunch. In an income statement dated October 8, 2021, only *four (4) days* after the effective date of the MSA, ASL was shown to have already accumulated net income (a loss) of -$1,316,275.78.

37.     On December 3, 2021, Pennington (ASL's Chief Financial Officer) indicated that he was processing a transfer of $3 million from WPI to ASL. Despite this significant sum of money, Pennington only expected "…this transfer to cover anticipated expenses and payroll through the month of December."

38.     Days later, on December 10, 2021, ASL made four payments to MBO totaling $489,973.53. *See* Exhibit "A." On December 17, 2021, ASL made two more payments to MBO totaling $281,607.60. *See* Exhibit "A." These payments to MBO only caused ASL further financial

distress. Indeed, days later, on December 20, 2021, Pennington internally circulated a year-to-date income statement which reflected that ASL's accumulated net income (loss) was now at -$9,939,502.00.

39.   Unable to stand on its own, ASL relied on WPI for financial stability – or lack thereof (the vast majority of cash inflows into the Debtor originated from WPI). WPI, however, was under no obligation to continue to capitalize ASL, and WPI had its own cash flow problems.

40.   In addition to the income statement, with Pennington's December 20, 2021, transmission, Pennington also circulated the year-to-date balance sheet for WPI. This balance sheet reflected that WPI was financially vulnerable as of December 20, 2021, with WPI's total liabilities ($53,398,320.00) exceeding assets ($52,227,002.00). And the situation only got worse. Eight days later, on December 28, 2021, the Director of Accounting, Gardner Bell ("Bell"), circulated an updated year-to-date balance sheet for WPI to Pennington and Bryan Joiner (a certified public accountant who worked with Neugebauer's family office ("Joiner")), which reflected increasing financial vulnerability, with total liabilities increased to $53,685,719.28 and assets decreased to $51,486,938.72.

41.   On January 10, 2022, Pennington acknowledged to ASL's outside accountants that as to both ASL and WPI, "… we will be in the 'no-revenue' phase until probably April of 2022." Nonetheless, and with what was clearly an unreasonably small amount of capital, ASL pushed forward in incurring debts that were clearly beyond its ability to pay timely.

42.   Evidencing this fact, on January 14, 2022, Pennington emailed Neugebauer that:

> Based on invoices received, payroll processed and estimated expenses, we need to transfer $7.5MM of cash from the operating accounts from With Purpose, Inc. to Animo Services.

---

**AMENDED COMPLAINT**                                                                 **Page 15 of 32**

43.     Four days later, on January 18, 2022, ASL made four payments to MBO totaling $428,789.30. *See* Exhibit "A." These four payments were followed by seven more to MBO on January 31, 2022 ($618,078.00), and another two payments on February 7, 2022 ($15,615.00), all totaling $633,693.00. *See* Exhibit "A."

44.     On February 15, 2022, Bell circulated the completed 2021 year-end financials to ASL's outside accountants. These financials reflect that as of November 20, 2021, ASL had total assets of $991,283.00, with total liabilities of $1,168,813.00. From a market value perspective, this financial vulnerability and/or insolvency was actually deeper than it appeared as $773,748.00 of "assets" took the form of "Software In Process." While this looks nice on a balance sheet, in reality, the "software in process" (*i.e.,* the Tech Stack) never came to complete fruition. Thus, this "software in process" cannot be considered when determining financial vulnerability (including insolvency) in the context of the fraudulent transfer analysis.[5]

45.     As such, ASL was also financially vulnerable and/or insolvent as of December 31, 2021. The ASL balance sheet for this period, as circulated by Bell on February 15, reflects non-"Software in Process" assets in the total amount of $2,380,320.72. Liabilities, on the other hand, were almost double: $4,442,915.43. Of these liabilities, accrued and unpaid expenses – in large part due and owing to unsecured vendors – totaled $4,438,756.10.

---

[5] The Court has already considered evidence supporting this conclusion, including but not limited to: (i) evidence that "[a]t a board meeting on June 30, 2022, Mr. Kang, [WPI]'s chief operating officer, 'opined that the tech stack is not transferable because it is a bespoke development.' [Bank. Dkt. No. 563, p. 40 of 97]; and (ii) finding that Trustee's expert "Mr. Crawford credibly testified that there is a preconception that such uncompleted software should be valued at **zero**." (*emphasis in original*) [Bank. Dkt. No. 563, p. 37 of 97]. Thus, even though the Tech Stack certainly may have had "value" for purposes of valuing the GloriFi enterprise on a go forward basis in the event of a business combination (*e.g.*, GloriFi's contemplated de-SPAC transaction), the Debtor was financially vulnerable and/or insolvent at or near the time of the transfers at issue in this lawsuit as discussed herein.

46.     In turn, WPI, the parent to which ASL looked to provide its "allowance," continued dealing with WPI's own financial vulnerability. As of December 31, 2021, WPI's balance sheet reflected total assets of $52,127,041.93, while having total liabilities of $54,203,921.18.

47.     **MBO (and TGR) nonetheless continued to get paid**. ASL paid MBO $2,602.50 on February 16, 2022 (1 payment); $268,907.40 on February 18, 2022 (in three payments); and $12,924.00 on February 22, 2022 (in six payments). *See* Exhibit "A".

48.     Despite these payments, on February 22, 2022, Bell emailed Pennington and Joiner, regarding yet another liquidity crisis, acknowledging that ASL had incurred debts (including with MBO) beyond ASL's ability to pay:

> Based on my current cash projection below, I'm making a capital call of $5,000,000 from With Purpose Inc. to Animo Services LLC.  Would you please review and elevate to Toby for approval if you agree with these projections?
>
> - ~$1MM Payroll estimate (next 3 cycles):
>   - Feb 25th $315,000
>   - March 11th $335,000
>   - March 25th $350,000
>
> - ~$4MM Invoice estimate:
>   - ~$2.5MM for unpaid invoices at Animo Services LLC
>     - $2.2MM of that is concentrated within KPMG, EastBanc, MBO, and Micro Focus
>   - ~1.5MM for 2 larger invoices budgeted in February but not yet received ($750k Lexis Nexis & $800k Unqork)
>
> - **Total Call of $5,000,000**

In response, Joiner acknowledged ASL's woeful undercapitalization resulting in a continuous need for cash handouts:

> Thanks Gardner! Is this proposed through March? I thought we would be close to out of current cash by end of march?

49.      In short succession thereafter, from February 24, 2022, through March 4, 2022, ASL made *twenty-six* **different payments to MBO**, totaling $1,476,527.16. *See* Exhibit "A". These payments led to yet another liquidity crisis; on March 16, 2022, Bell sent the following email internally with the subject line "ASL Capital Call – urgent":

Based on my current cash projection below, I'm making a capital call of $3,500,000 from With Purpose Inc. to Animo Services LLC.  Would you please review and elevate to Toby for approval if you agree with these projections?

Once we pay invoices received and run payroll on March 25th, we will have less than $1MM between the two accounts.

| Animo Services LLC | | With Purpose Inc. | |
|---|---|---|---|
| 545 | Current Balance | 4,900 | Current Balance |
| (378) | MBO invoice due today | (729) | WPI Invoices outstanding |
| (515) | March 25th payroll | (350) | March 25th payroll |
| (2,622) | ASL invoices outstanding* | (3,500) | Capital Call |
| 3,500 | Capital Call | | |
| 530 | Remaining Balance | 321 | Remaining Balance |

*in thousands (000s)*

*\*Excludes MBO invoice due today, but includes all invoices due beginning next week and beyond.*

50.      In response, Joiner forwarded the email to Neugebauer stating:

Toby,

See below. We have approximately 9 days of cash flow remaining.

51.      Despite this clear financial distress, unsurprisingly, Neugebauer ensured that his long-time close friend and business partner Everson's companies continued receiving payments. Despite the numerous other outstanding payables, on March 16, 2022, ASL paid MBO

$387,702.17. *See* Exhibit "A."

52.      On March 21, 2022, Bell internally circulated a report entitled "Cash Balances and Top 15 Unpaid Invoices *as of 3/18/22*." This report showed that ASL had a $3,461,000.00 cash balance, but also that 12 of the top 15 *unpaid* invoices across all the GloriFi entities belonged to ASL and totaled $3,314,000.00. Of these 12 unpaid invoices, 4 of them – in the total amount of $819,000 – were attributable to MBO (and TGR). Accounting for all 12 invoices, ASL had a remaining cash balance of $147,000.00, but that also did not account for invoices under the "top 15" nor the expense of ASL's payroll, which was historically high (*see* Bell's March 16 email above). Thus, ASL's debts/obligations exceeded its cash on hand.

53.      The next day, ASL paid MBO a total of $433,750.20 in two payments. *See* Exhibit "A".

54.      Also on March 22, 2022, a "Balance Sheet Reconciliation Package" for both ASL and WPI were circulated for Bell's review. Each package purportedly reconciled that entity's books for the first quarter of 2022. In the package, ASL's balance sheet reflected that as of March 31, 2022, after omitting "Total Software in Process," ASL was insolvent in the amount of $488,480.24. It is unclear whether this balance sheet accounts for the two payments (totaling $10,922.82) ASL made to MBO on March 29, 2022. *See* Exhibit "A." Further, this balance sheet reflected ASL's accrued and unpaid expenses to be $2,864,800.96, stemming from ASL's failure to pay no less than 20 different vendors as well as various payroll expenses. Similarly, WPI's balance sheet reflects that as of March 31, 2022, its liabilities exceeded its assets in the amount of $1,983,613.25.

55.      Following these quarterly reports, on April 4, 2022, Bell circulated an email internally which stated:

> Cash levels
> - We are monitoring cash levels very closely and have placed all vendor payments on hold
> - Unless cash comes in Tues/Wed, we will need to move money between accounts (WPI, ASL, MGA) to cover payroll at the various entities

Attached to this email was an updated report entitled "Cash Balances and Top 15 Unpaid Invoices *as of 3/31/22*." This latest report showed that ASL was down to a cash balance of $1,414,000.00, and that 9 of the top 15 *unpaid* invoices across all entities belonged to ASL, totaling $2,963,000. The largest of these unpaid invoices belonged to none other than MBO, in the reported amount of $708,000.00. These 9 unpaid invoices alone reflected ASL's insolvency in the amount of $1,549,000.00, and again did not account for invoices outside the "top 15" or the expense of ASL's payroll.

56.   On April 8, 2022, ASL made four payments to MBO totaling $741,492.00. *See* Exhibit "A."

57.   Days later, on April 15, 2022, Bell sent an email internally which once again evidences the fact that ASL was engaged in a business where the remaining property constituted unreasonable capital, and that ASL continued to incur debts that were beyond its ability to pay:

> Please see the budget to actual reporting for the week ending 4/15/22. Cash levels remain low, while high volumes of invoices continue to come in. I know that funding is in process but for transparency, I wanted to call out the vendors who have large invoices due this week that will not be paid. Let me know if you have any questions.

Bell's email also attached a new version of the prior cash balances report. Titled "Cash Balances and Top 15 Unpaid Invoices *as of 4/15/22*," this updated report emphasized ASL's continued cash burn. ASL was shown to have a cash balance at that time of only $297,000.00, while having outstanding balances of at least $3,076,000.00. This left a substantial deficiency of $2,799,000.00.

---

**AMENDED COMPLAINT**                                                    **Page 20 of 32**

58. ASL turned to its GloriFi affiliates to play the shell game of money transferring ASL had grown accustomed to and relied upon. After one or more internal transfers, and in response to internal communications between the GloriFi entities regarding transfers of funds between the entities, on April 26, 2022, Pennington acknowledged that:

> We have existing vendor invoices for GloriFi And Animo Services that are a couple of weeks past due and several of those are integral to day 1 operation.
> We are in an unfortunate situation and I really wish we were not.

59. Despite this statement, and unsurprisingly, the next day, ASL made two payments to MBO (and TGR) in total amount of $87,262.21. *See* Exhibit "A".

60. On May 5, 2022, Bell emailed Pennington and Joiner on the state of the GloriFi entities collectively, stating that "[a]s of today though we are flat out of money."

61. Somehow, however, Defendants were able to squeeze an additional $3,523,850.72 through *50* separate transfers by the Debtor between May 17, 2022, through November 1, 2022. *See* Exhibit "A."

62. ASL made no further payments to the Defendants. With the gravy-train permanently in the station, Everson had no further use for TGR – it had served its purpose in the Defendants' scheme. On March 10, 2023, approximately 4 months after ASL made its final payment to the Defendants, TGR forfeited its existence with the State of Texas.

63. All told, as specifically detailed on the attached and incorporated Exhibit "A," the Debtor paid a total of $8,789,004.61 to Defendants from a Frost Bank Checking Account. Each of these payments were made by the Debtor at a time when the Debtor was clearly financially vulnerable and/or insolvent.

64. During the one-year period prior to the Petition Date, that is between January 4, 2022, and January 4, 2023, the Debtor made transfers of an interest of the Debtor's property to or for the benefit of the Defendants through payments totaling not less than $8,008,423.48 (collectively, the "1-Year Transfers"). *See* Exhibit "A".

65. Earlier, from December 10, 2021 to January 3, 2022, the Debtor made additional transfers of an interest of the Debtor's property to or for the benefit of the Defendants through payments totaling not less than $780,581.13 (collectively, the "Year 2 Transfers," and together with the 1-Year Transfers, the "Transfers"). *See* Exhibit "A."

66. Further, due to his close relationship with Neugebauer, his involvement with the GloriFi enterprise at large, and the fact that his employees were embedded in the Debtor's operations (*see e.g.,* the Insider SOW), Everson had reasonable cause to believe that the Debtor was insolvent and/or financially vulnerable. Because the knowledge of Everson (as a principal and managing/controlling person and/or officer of Defendants) is imputed to the Defendants, in addition to their independent knowledge, Defendants also had reasonable cause to believe that the Debtor was insolvent and/or financially vulnerable.

## V. CLAIMS FOR RELIEF

**A. COUNT I: Avoidance of the 1-Year Transfers as Insider Preferences (11 U.S.C. § 547)**

67. The Trustee hereby incorporates all of the foregoing and ensuing facts and allegations as if set forth hereat.

68. Each of the 1-Year Transfers was made within one (1) year prior to the Petition Date.

69. Each of the 1-Year Transfers represented a transfer of an interest of the Debtor in property.

---

70.     Each of the 1-Year Transfers occurred when the Debtor was insolvent.

71.     Defendants were both insiders of the Debtor at the time of each of the 1-Year Transfers.

72.     Each of the 1-Year Transfers was made by the Debtor to MBO, a creditor of the Debtor at the time of each of the 1-Year Transfers, on account of antecedent debt owed by the Debtor to the Defendants. MBO is the initial transferee of each of the 1-Year Transfers, and TGR, who was also a creditor of the Debtor at the time of each of the 1-Year Transfers, is the immediate transferee of such transfers. Because the knowledge of Everson is imputed to TGR, in addition to its independent knowledge, TGR did not take such transfers in good faith, it did not take for value, and it did not take without knowledge of the voidability of the transfers.

73.     Each of the 1-Year Transfers enabled Defendants to receive more than they would have had the 1-Year Transfers not been made, and had the Debtor then been liquidated through Chapter 7 and Defendants were paid through such liquidation.

74.     Without waiver of any privileges, and solely to the extent necessary to affirmatively satisfy 11 U.S.C. § 547(b), and to the extent applicable, the Trustee has reasonably investigated the circumstances of the 1-Year Transfers under the circumstances, including reviewing the Debtor's bank statements and/or other financial records, taking into account known facts and allegations and reasonably considering potential defenses and affirmative defenses of the Defendants, concluding that it is unlikely that the Defendants have any valid contemporaneous exchange, ordinary course, or new value affirmative defenses, including because of the unordinary timing of each of the payments compared to the others, the frequency and quantity of such transfers, the unsecured nature of the alleged debt, the insider nature of Defendants and their influence over the Debtor, and the fact that most other creditors of the Debtor at that time were

paid *far* less. In a nutshell, the evidence suggests that the 1-Year Transfers were truly preferential transfers designed to benefit insiders, at the expense of other creditors, because Neugebauer wanted to ensure Everson got paid, and handsomely (potentially so that Neugebauer and/or entities owned and/or controlled by Neugebauer – or in which Neugebauer has some financial stake – could take a cut of the substantial funds being skimmed and wrongfully taken from the Debtor).

75.     Accordingly, the Trustee is entitled to avoid each of the 1-Year Transfers pursuant to Section 547(b) of the Bankruptcy Code.

**B.     COUNT II: Avoidance of the Transfers as Actual Fraudulent Transfers (11 U.S.C. § 548(a)(1)(A))**

76.     The Trustee hereby incorporates all of the foregoing and ensuing facts and allegations as if set forth hereat.

77.     The Trustee asserts this Count II in the alternative to Count I.

78.     Each of the Transfers represented a transfer of an interest of the Debtor in property.

79.     MBO is the initial transferee of each of the Transfers, and TGR is the immediate transferee of such Transfers. Because the knowledge of Everson is imputed to both MBO and TGR, in addition to both Defendants' independent knowledge, MBO and TGR did not take such transfers in good faith, they did not take for value, and they did not take without knowledge of the voidability of the Transfers.

80.     The Transfers were made with the intent to hinder, delay or defraud any entity to which the Debtor was or became indebted, on or after the date that such Transfers were made or such obligation was incurred. Numerous badges of fraud surround the Transfers. First, the Defendants were insiders of the Debtor. Second, the Debtor was either insolvent or became insolvent shortly after each Transfer was made or obligation was incurred. Third, the Debtor paid in excess of fair market value for the over-staffed, over-billed, and duplicative "services" it

---

purportedly received in exchange for the Transfers. In fact, the purported services were worth very little since they never resulted in their intended purpose – the Tech Stack coming to fruition. Fourth, both the MSA and the Defendants' self-serving relationship with the Debtor were orchestrated by Neugebauer and Everson. Neugebauer's primary focus was on his own benefit and for the benefit of his friends and business associates, including the Defendants.

81.     Accordingly, pursuant to section 548(a)(1)(A) of the Bankruptcy Code, the Trustee requests the avoidance of each of the Transfers.

**C.      COUNT III: Avoidance of the Transfers as Actual Fraudulent Transfers under TUFTA[6] (TEX. BUS. & COMM. CODE § 24.005(a)(1))**

82.     The Trustee hereby incorporates all of the foregoing and ensuing facts and allegations as if set forth hereat.

83.     In the alternative, the Trustee also pleads that the Transfers were actual fraudulent transfers under TUFTA.

84.     It is clear that ASL had a continuous history of incurring debts that it had no ability to pay, including debts owed to a multitude of vendors and its own employees. At the time of each of the Transfers, ASL had multiple unsecured creditors who were owed millions of dollars – as reflected on ASL's balance sheets and other financials (including, but not limited to, the cash balance and unpaid invoice reports referenced above). Unsurprisingly, multiple of these unsecured creditors were still owed by ASL on the Petition Date, as reflected, in part, by ASL's claims register in the underlying bankruptcy case (such as vendor Transmit Security, Inc., as one example, whose proof of claim arises from its September 30, 2021 contract with the Debtor). Pursuant to Section 544 of the Bankruptcy Code, the Trustee stands in the shoes of, and may avoid, a pre-petition transfer by the Debtor that any of these unsecured creditors could avoid.

---

[6] The Texas Uniform Fraudulent Transfer, TEX. BUS. & COMM. CODE §§ 24.001, *et seq.*, ("TUFTA").

85.     For each of the same reasons that the Transfers are actual fraudulent transfers under Section 548(a)(1)(A) of the Bankruptcy Code, the Transfers are also actual fraudulent transfers under Section 24.005(a)(1) of TUFTA. Accordingly, pursuant to Section 544 of the Bankruptcy Code, the Trustee is entitled to avoid the Transfers. Moreover, pursuant to Section 24.013 of TUFTA, the Trustee is entitled to her reasonable costs and attorneys' fees in avoiding and recovering the Transfers.

**D.      COUNT IV: Avoidance of the Transfers as Constructively Fraudulent Transfers under the Bankruptcy Code (11 U.S.C. § 548(a)(1)(B))**

86.     The Trustee hereby incorporates all of the foregoing and ensuing facts and allegations as if set forth hereat.

87.     In the alternative, the Trustee pleads that the Transfers were constructively fraudulent transfers under Section 548(a)(1)(B) of the Bankruptcy Code.

88.     From inside the Debtor, the Defendants directed the over-staffing of a "small army" of over-priced outsourced programming, which never resulted in a fully realized Tech Stack. The curious "Project Ewing" was intended only to line the pockets of Everson and the Defendants. The Debtor received no value, much less reasonably equivalent value, in exchange for the $8,789,004.61 of Transfers.

89.     As reflected herein, the Debtor was insolvent at the time of each of the Transfers, or became insolvent as a result of the Transfers. In the alternative, at the time of each of the Transfers, the Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor was an unreasonably small capital. In the further alternative, at the time of each of the Transfers, the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

**AMENDED COMPLAINT**                                                                 **Page 26 of 32**

90.     Moreover, the Debtor made the Transfers to of for the benefit of insiders (the Defendants), or the Debtor incurred such obligations to or for the benefit of those same Defendant-insiders, under the MSA. The MSA was an employment contract between the Debtor and the Defendants, which was a sweet-heart deal intended only to benefit Everson and the Defendants. Accordingly, the MSA and the resulting Transfers were not in the ordinary course of business.

91.     Therefore, pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, the Trustee requests the avoidance of each of the Transfers.

**E.    COUNT V: Avoidance of the Transfers as Constructively Fraudulent Transfers under TUFTA (TEX. BUS. & COMM. CODE § 24.005(a)(2))**

92.     The Trustee hereby incorporates all of the foregoing and ensuing facts and allegations as if set forth hereat.

93.     In the alternative, the Trustee also pleads that the Transfers were constructively fraudulent transfers under Section 24.005(a)(2) of TUFTA.

94.     For all the reasons previously outlined herein, the Debtor did not receive reasonably equivalent value in exchange for the Transfers.

95.     The Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor were unreasonably small in relation to the business or transaction; or the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

96.     For these reasons, the Transfers are also constructively fraudulent transfers under Section 24.005(a)(2) of TUFTA. Accordingly, pursuant to Section 544 of the Bankruptcy Code, the Trustee is entitled to avoid the Transfers. Moreover, pursuant to Section 24.013 of TUFTA, the Trustee is entitled to her reasonable costs and attorneys' fees in avoiding and recovering the Transfers.

**F.    COUNT VI: Avoidance of the Transfers as Constructively Fraudulent Transfers under TUFTA (TEX. BUS. & COMM. CODE § 24.006(b))**

97.    The Trustee hereby incorporates all of the foregoing and ensuing facts and allegations as if set forth hereat.

98.    In the alternative, the Trustee also pleads that the Transfers were constructively fraudulent transfers under Section 24.006(b) of TUFTA.

99.    As stated above, the Debtor had multiple unsecured creditors who were owed millions of dollars at the time of each of the Transfers. As also stated above, the Transfers were made to Defendants, who were insiders of the Debtor, for an antecedent debt at a time when the Debtor was insolvent.

100.    Further, due to his close relationship with Neugebauer, his involvement with the GloriFi enterprise at large, and the fact that his employees were embedded in the Debtor's operations (*see, e.g.*, the Insider SOW), Everson had reasonable cause to believe that the Debtor was insolvent. Because the knowledge of Everson (as a principal and managing/controlling person and/or officer of Defendants) is imputed to the Defendants, in addition to their independent knowledge, Defendants also had reasonable cause to believe that the Debtor was insolvent.

101.    For these reasons, the Transfers are also constructively fraudulent transfer pursuant to Section 24.006(b) of TUFTA. Accordingly, pursuant to Section 544 of the Bankruptcy Code, the Trustee is entitled to avoid the Transfers. Moreover, pursuant to Section 24.013 of TUFTA, the Trustee is entitled to her reasonable costs and attorneys' fees in avoiding and recovering the Transfers.

**G.    COUNT VII: Recovery of Voidable Transfers (11 U.S.C. § 550)**

102.    The Trustee hereby incorporates all of the foregoing and ensuing facts and allegations as if set forth hereat.

---

**AMENDED COMPLAINT**                                                    **Page 28 of 32**

103.   For the reasons set forth herein, the Transfers are voidable.

104.   Defendants were either the initial transferee of each of the Transfers, or the immediate or mediate transferee of such initial transferee, or each of the Transfers were made for one or both of the Defendants' benefit.

105.   Pursuant to Section 550 of the Bankruptcy Code, the Trustee is entitled to recover the Transfers, in the total amount of $8,789,005.61, and hereby seeks a money judgment against the Defendants in at least that amount.

**H.     COUNT VIII: Disallowance of Claim (11 U.S.C. § 502)**

106.   The Trustee hereby incorporates all of the foregoing and ensuing facts and allegations as if set forth hereat.

107.   MBO is the initial transferee of each of the Transfers, and TGR is the immediate transferee of such Transfers. As such, the Transfers are recoverable pursuant to Section 550 of the Bankruptcy Code.

108.   Neither of the Defendants has paid back any portion of the Transfers.

109.   Accordingly, pursuant to Section 502(d) of the Bankruptcy Code, any Claim[7] Defendants and/or its assignees may have against the Debtor or the Estate must be disallowed at least until such time as the Defendants pay to the Trustee an amount equal to the aggregate amount of the Transfers, plus interest thereon.

110.   Moreover, pursuant to Section 502(j) of the Bankruptcy Code, any Claim either Defendant and/or its assignees may have against the Debtor or the Estate which may have been previously allowed in the Bankruptcy Case, must be reconsidered and disallowed at least until such time as the Defendant pays to the Trustee an amount equal to the aggregate amount of the

---

[7] As that term is defined in Section 101(5) of the Bankruptcy Code.

**AMENDED COMPLAINT**                                                    **Page 29 of 32**

Transfers, plus interest thereon.

111.    If Defendants fail to pay to the Trustee an amount equal to the aggregate amount of the Transfers, plus interest thereon, the Trustee hereby requests that the Bankruptcy Court disallow all Claims of the Defendants.

**I.      COUNT IX: Pre-Judgment Interest, Attorneys' Fees, and Expenses**

112.    The Trustee hereby incorporates all of the foregoing and ensuing facts and allegations as if set forth hereat.

113.    The Trustee is also entitled to recover pre-judgment interest from the Defendants at the federal post-judgment rate from the date of each Transfer until the date of the judgment.

114.    The Trustee is also entitled to recover her reasonable costs and attorneys' fees from the Defendants as incurred in avoiding and recovering the Transfers pursuant to Section 24.013 of TUFTA.

**VI.      PRAYER**

WHEREFORE, PREMISES CONSIDERED, the Trustee respectfully requests that the Court render judgment for the Trustee and against Defendants, jointly and severally, providing for:

(i)      avoidance of the 1-Year Transfers, upon the law and the facts as a preference under Section 547 of the Bankruptcy Code;

(ii)      alternatively, avoidance of the Transfers under Section 548 of the Bankruptcy Code and TUFTA as actual fraudulent transfers;

(iii)      alternatively, avoidance of the Transfers under Section 548 of the Bankruptcy Code and TUFTA as constructively fraudulent transfers;

(iv)      recovery of the Transfers by way of money judgment against the Defendants, jointly and severally;

(v)     reasonable attorneys' fees and costs;

(vi)    pre-judgment interest and post-judgment interest at the highest rate allowed by law; and

(vii)   such other and further relief, at law or in equity, to which the Trustee may be entitled.

Respectfully submitted,

/s/ Chase J. Potter

**CHASE J. POTTER**
Texas Bar No. 24088245
E-Mail: potter@imcplaw.com

**GREG MCALLISTER**
Texas State Bar No. 24071191
E-Mail: greg@imcplaw.com

**JOSHUA L. SHEPHERD**
Texas Bar No. 24058104
E-Mail: shepherd@imcplaw.com

**JESSE A. OKIROR**
Texas State Bar No. 24065843
E-Mail: jesse@imcplaw.com

**IACUONE MCALLISTER POTTER PLLC**
Energy Square One
4925 Greenville Ave., Suite 1112
Dallas, Texas 75206
Telephone:     (214) 432-1536

**COUNSEL FOR THE AGENT AND
SPECIAL COUNSEL FOR TRUSTEE**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing document was served on all counsel of record via the Court's ECF system on this 11th day of August, 2025.


*/s/ Chase J. Potter*
**CHASE J. POTTER**